Michael J. Riela
TANNENBAUM HELPERN SYRACUSE & HIRSCHTRITT LLP
900 Third Avenue, 13th Floor
New York, New York 10022
Telephone: (212) 508-6700
Facsimile: (212) 371-1084
Email: Riela@thsh.com

*Counsel to Defendant Manhattan Beer Distributors, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 15-23007 (RDD)<br><br>(Jointly Administered) |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS on behalf of the bankruptcy estate of THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., *et al.*,<br><br>        Plaintiff,<br><br>v.<br><br>MANHATTAN BEER DISTRIBUTORS, INC.,<br><br>        Defendant. | Adv. Pro. No. 17-08263 (RDD) |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
DISMISS *WITH PREJUDICE* THE CREDITORS' COMMITTEE'S COMPLAINT
FOR AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: 2008 Broadway, Inc. (0986); The Great Atlantic & Pacific Tea Company. Inc. (0974); A&P Live Better, LLC (0799); A&P Real Property, LLC (0973); APW Supermarket Corporation (7132); APW Supermarkets, Inc. (9509); Borman's, Inc. (9761); Delaware County Dairies, Inc. (7090); Food Basics, Inc. (1210); Kaik Save Inc. (3636); McLean Avenue Plaza Corp. (5227); Montvale Holdings. Inc. (6664); Montvale-Para Holdings. Inc. (2947); Onpoint, Inc. (6589); Pathmark Stores, Inc. (9612); Plainbridge TLC (5965); Shopwell, Inc. (0301): Super Fresh Food Markets, Inc. (2491); The Old Wine Emporium of Westport, Inc. (0724); Tradewell Foods of Conn., Inc. (5718); and Waldbaum, Inc. (8599).

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES .............................................................................. ii

PRELIMINARY STATEMENT ......................................................................... 1

BACKGROUND .............................................................................................. 4

    A.    Chapter 11 Proceedings ..................................................................... 4

    B.    New York State Alcoholic Beverage Control Law............................... 5

    C.    The Critical Vendor Motion and the Critical Vendor Orders ............... 6

    D.    The Complaint .................................................................................... 9

STANDARDS FOR DISMISSAL OF THE COMPLAINT ................................. 9

LEGAL AUTHORITY .................................................................................... 10

    A.    DEFENDANT'S ORDINARY COURSE OF BUSINESS DEFENSE  UNDER
        SECTION 547(C)(2)(B) WARRANTS DISMISSAL OF THE COMPLAINT......... 11

    B.    PLAINTIFF CANNOT ESTABLISH THE SECTION 547(B)(5) ELEMENT OF ITS
        PREFERENCE CLAIM.................................................................................. 13

    C.    THIS PREFERENCE ACTION HAS BEEN WAIVED UNDER THE CRITICAL
        VENDOR ORDERS .................................................................................... 17

CONCLUSION............................................................................................... 18

Pg 3 of 24

## TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page(s)**

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) .............................. 9, 10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ....... 9, 10

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
   369 F.3d 212 (2d Cir. 2004) ........................................................................................... 10

*Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.)*,
   315 F.3d 1192 (9th Cir. 2003), amended by 326 F.3d 1028 (9th Cir. 2003)........................ 12

*HLI Creditor Trust v. Export Corp. (In re Hayes Lemmerz Int'l, Inc.)*,
   313 B.R. 189 (Bankr. D. Del. 2004) ................................................................................. 17

*In re AFA Investment Inc. v. Trade Source, Inc. (In re AFA Investment, Inc.)*,
   538 B.R. 237 (Bankr. D. Del. 2015) ................................................................................. 17

*In re Friedman's Inc.*, 738 F.3d 547 (3d Cir. 2013) ......................................................... 16

*In re Furr's Supermarkets, Inc.*, 485 B.R. 672 (Bankr. D. N.M. 2012) ........................... 17

*In re Kiwi Int'l Airlines, Inc.*, 344 F.3d 311 (3d Cir. 2003)...................................... 13, 17

*In re Lyondell Chemical Co.*, No. 10-05358, 2015 Bankr. LEXIS 3156, 2015 WL 5560283
   (Bankr. S.D.N.Y. Sept. 18, 2015)..................................................................................... 12

*In re Oakwood Homes Corp.*, 394 B.R. 352 (Bankr. D. Del. 2008)................................. 17

*In re Quisenberry*, 295 B.R. 855 (Bankr. N.D. Tex. 2003) ............................................. 17

*In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029 (7th Cir. 1993)........................................ 12

*Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30 (2d Cir. 1996)........... 10, 11, 12

*Papasan v. Allain*, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ................... 10

*Pereira v. United Parcel Service of America, Inc. (In re Waterford Wedgwood USA, Inc.)*, 508
   B.R. 821, 828-29 (Bankr. S.D.N.Y. 2014) ....................................................................... 12

*Seidle v. GATX Leasing*, 778 F.2d 659 (11th Cir. 1985) ................................................. 17

*Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002)............................................... 10

*Zenith Industrial Corp. v. Longwood Elastomers, Inc. (In re Zenith Industrial Corp.)*,
   319 B.R. 810 (Bankr. D. Del. 2005) ................................................................................. 17

**Statutes**                                                                        **Page(s)**

11 U.S.C. § 547(b)(5) ................................................................................. 13

11 U.S.C. § 547(c)(2) .................................................................. 10, 11, 12, 13

11 U.S.C. § 547(g) ...................................................................................... 10

*Fed. R. Bankr. P.* 7012(b) ............................................................................. 9

*Fed. R. Civ. P.* 12(b)(6).......................................................................... 9, 10


**Other Authorities**                                                               **Page(s)**

N.Y. Comp. Codes R. & Regs. Tit. 9 § 68.6........................................... 2, 15

State of New York Liquor Authority Declaratory Ruling 2011-03141C ....................................... 5

Defendant Manhattan Beer Distributors, Inc. (the "Defendant"),[2] by its undersigned counsel, respectfully submits this Memorandum of Law in support of its motion to dismiss *with prejudice* The Official Committee of Unsecured Creditors' Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") pursuant to *Fed. R. Civ. P.* 12(b)(6) and *Fed. R. Bankr. P.* 7012(b).

## PRELIMINARY STATEMENT

None of the alleged transfers that are the subject of the Complaint are avoidable as preferences for reasons that include each of the following independent grounds:

**First**, The Official Committee of Unsecured Creditors (the "Committee") cannot rebut the Defendant's ordinary course of business defense under Section 547(c)(2)(B) of the Bankruptcy Code. The transfers at issue in the Complaint were in payment of debts incurred by A&P in the ordinary course of business or financial affairs of The Great Atlantic & Pacific Tea Company ("A&P" or the "Debtors") and Manhattan Beer Distributors LLC ("MBD"). The Committee acknowledged as much in Paragraph 10 of the Complaint, where it alleged that A&P made the transfers at issue "for goods and/or services provided to the Debtors pursuant to invoices or statements submitted by Defendant to the Debtors ...". Accordingly, the first requirement of Section 547(c)(2) is satisfied.

The second requirement of Section 547(c)(2)(B) is also satisfied, as the alleged transfers were made according to ordinary business terms. Under Section 101-aaa of the New York State Alcoholic Beverage Control Law, wholesalers of beer (such as MBD) may sell beer to retailers

---

[2] Manhattan Beer Distributors, Inc., the entity that was named as a defendant in the Complaint, is a member of Manhattan Beer Distributors LLC, a New York limited liability company. Manhattan Beer Distributors LLC (rather than Manhattan Beer Distributors, Inc.) was the entity that delivered beer to A&P while it conducted business, and the transfers on Exhibit "A" to the Complaint were made to Manhattan Beer Distributors LLC, not to Manhattan Beer Distributors, Inc.

(such as A&P) only for cash at the time of delivery, or under the credit terms set forth in Section 101-aaa and in the *2015 Beer and Wine Products Credit Calendar* (the "2015 Credit Calendar")[3] issued by the New York State Division of Alcoholic Beverage Control, State Liquor Authority (the "SLA"). If A&P fails to pay the wholesaler for acquired beer in accordance with the 2015 Credit Calendar, the wholesaler reports this payment delinquency as per the 2015 Credit Calendar. Based on that reported delinquency, A&P would be precluded from purchasing alcoholic beverage products from any wholesaler in New York State except under cash-on-delivery terms.[4]

The 2015 Credit Calendar represents the "ordinary business terms" for A&P and MBD for purposes of Section 547(c)(2)(B), because that calendar contains the customary terms and conditions applicable to *all* wholesale sales and purchases of beer in New York State in 2015. Since the alleged transfers at issue in this adversary proceeding were for beer purchased by A&P from MBD in 2015 and were made in accordance with these customary business terms, the Committee cannot overcome this defense and the Complaint should be dismissed.

**Second,** the Committee cannot satisfy its burden under Section 547(b)(5) of the Bankruptcy Code to demonstrate that the alleged transfers enabled Defendant to receive more than it would have received in a Chapter 7 case. The New York State Alcoholic Beverage Control Law required A&P to pay *in full* for all the beer it purchased from MBD in accordance with the 2015 Credit Calendar. Under the critical vendor orders that this Court entered early in these Chapter 11 cases (the "Critical Vendor Orders"), A&P paid the balance of the pre-petition debt it

---

[3] The 2015 Credit Calendar (pertaining to the year in which the alleged transfers were made) is available online at https://www.sla.ny.gov/system/files/2015-beer-wine-product-credit-calendar.pdf, and is attached hereto as Exhibit 1.

[4] N.Y. Comp. Codes R. & Regs. Tit. 9 § 68.6 ("Subsequent to the receipt of a notice of default from any wholesaler no retail licensee shall purchase or accept any delivery of alcoholic beverages except for cash until such time as he has received a release in writing from the Liquor Authority or his name is removed from the delinquent list …").

owed to MBD.   Had A&P not done so, it would not have been permitted to buy alcoholic beverages from any wholesaler in New York State on credit terms, but rather would have been required to pay cash upon delivery.  In other words, A&P was required to pay MBD *in full* for all beer it purchased pre-petition from MBD during 2015 – *either before or after these Chapter 11 cases were commenced* – to retain the ability to obtain reasonable credit terms that the Debtors have admitted were essential to the success of their Chapter 11 cases.  For that reason alone, the Complaint fails to state a claim for relief, as the Committee cannot demonstrate that the alleged transfers enabled Defendant to receive more than it would have received in a Chapter 7 case.

**Third,** dismissal of this adversary proceeding is necessary to prevent the Committee from unfairly reneging on the post-petition bargain between A&P and MBD, as established by the Critical Vendor Orders.  Under those Orders, MBD agreed to assume the substantial financial risk (including the risk of administrative insolvency) of continuing to sell large quantities of beer on customary credit terms to the financially-strapped Debtors after the commencement of these Chapter 11 cases, in exchange for payment of MBD's pre-petition debt.  However, nothing in the Critical Vendor Orders gave MBD, a critical vendor, notice that the Debtors' bankruptcy estates might later pursue this preference action to avoid and recover pre-petition payments that A&P had made to MBD under the 2015 Credit Calendar.  The contrived attempt by the bankruptcy estate to upset this bargain – by giving money to MBD with one hand through the Critical Vendor Orders, and taking it away from MBD with the other hand through this adversary proceeding – should be rejected by this Court through dismissal of the Complaint *with prejudice*.

**Fourth,** applying the principle of *expressio unius est exclusio alterius* (meaning the inclusion of one is to the exclusion of others), the Debtors' bankruptcy estates' right to bring a preference action against Defendant was waived under the Critical Vendor Orders.  The Critical

Vendor Orders – which applied to MBD, a major beer supplier of A&P – *did* preserve certain specific rights of the Debtors' estates, such as the estates' right to contest the extent, perfection, priority, validity or amounts of any claims or liens held by any critical vendor, and to seek the avoidance of liens held by critical vendors. Notably *omitted* from the Critical Vendor Orders (and from the Debtors' motion seeking those orders), however, was any provision preserving the bankruptcy estates' right to pursue preference actions against critical vendors. This material omission mandates dismissal of the Complaint.

## BACKGROUND

**A.    Chapter 11 Proceedings**

On July 19, 2015 (the "Commencement Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. As of the Commencement Date, the Debtors' primary retail operations consisted of supermarkets operated under a variety of trade names, including A&P, Waldbaum's, SuperFresh, Pathmark, Food Basics, The Food Emporium, Best Cellars and A&P Liquors. According to filings in these Chapter 11 cases, on the Commencement Date, the Debtors had almost 300 store locations.

According to filings in these Chapter 11 cases by the Debtors, over 200 of the Debtors' grocery stores have been sold, and the Debtors have ceased grocery operations and completed the liquidation of the inventory and furniture, fixtures and equipment located in their grocery stores. Further, according to these filings, after conducting an auction, the Debtors are selling and closing sales of fifteen of their sixteen liquor stores and two of the Debtors' five liquor licenses.

B.    **New York State Alcoholic Beverage Control Law**

Under Section 2 of the 21st Amendment to the U.S. Constitution, each State has the power to set its own laws regarding the transportation, importation, delivery or use of alcohol. New York State's laws are codified in the state's Alcoholic Beverage Control Law.

As stated in Section 2 of the New York State Alcoholic Beverage Control Law:

> "It is hereby declared as the policy of the state that it is necessary to regulate and control the manufacture, sale and distribution within the state of alcoholic beverages for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to law; for the primary purpose of promoting the health, welfare and safety of the people of the state, promoting temperance in the consumption of alcoholic beverages …"

In furtherance of this public policy to promote public health, welfare and safety, the distribution of alcoholic beverages in New York State is accomplished through a "three tier system."  With certain exceptions, brewers and other alcoholic beverage suppliers sell their products to wholesalers (like MBD) who, in turn, distribute the products to retailers (like A&P). *See, e.g.*, State of New York Liquor Authority Declaratory Ruling 2011-03141C.[5]  Further, to prevent alcohol suppliers and wholesalers from exerting undue control over retailers, the New York State Alcoholic Beverage Control Law places restrictions on the ability of an entity in one tier (*e.g.*, wholesalers) to have an interest in an entity in another tier of the industry (*e.g.*, retailers).  This is commonly known as a "tied-house" law.  *See* Section 101 of the New York State Alcoholic Beverage Control Law, providing that brewers and wholesalers may not be "interested" in retail premises.

Notably, to maintain the desired separation between wholesalers and retailers, the New York State Alcoholic Beverage Control Law seeks to ensure that alcohol retailers are not unduly

---

[5]    This Declaratory Ruling is available at https://www.sla.ny.gov/system/files/2011-03141CTied-houselawsforeignmanufacturers.pdf.

indebted to their wholesalers, to prevent wholesalers from exerting undue pressure on retailers. For example, under Section 101-aaa of the New York State Alcoholic Beverage Control Law, wholesalers of beer may *not* sell beer to retail licensees except for cash at the time of delivery or under the credit terms mandated in the SLA's Credit Calendar. Pursuant to that law, a retailer's failure to pay the wholesaler cash on delivery or within the credit terms in the SLA's Credit Calendar can result in the retailer not being permitted to acquire alcoholic beverages of any nature from any wholesaler in New York State, other than for cash on delivery.

**C.     The Critical Vendor Motion and the Critical Vendor Orders**

In their critical vendor motion [Docket No. 9] (the "Critical Vendor Motion"), the Debtors sought urgent critical vendor relief "to enable the Debtors to maintain access to necessary inventory on commercially reasonable terms," and "to preserve the going-concern value of their businesses." *See* Critical Vendor Motion, ¶ 2.

In support of their request for critical vendor relief, the Debtors stated that:

> "The requested authority will enable the Debtors to pay the prepetition claims (up to a cap) of only those vendors verified as 'critical' to the Debtors' operations, pursuant to a carefully-designed protocol overseen by a core, centralized team consisting of senior members of the Debtors' management and professional advisors."

> "The *quid pro quo* for the Debtors' payment of a [critical] vendor's prepetition claim will be that vendor's commitment to continue providing goods and services to the Debtors on trade terms at least as favorable as those terms in effect before the Commencement Date."

Critical Vendor Motion, ¶ 3.

The Critical Vendor Motion addressed the nature of the relief sought by the Debtors, and explained why such relief was "absolutely essential to the success of these Chapter 11 cases":

> "The Debtors rely on a network of vendors to provide a consistent stock of essential goods that customers expect to find in the

6

> Debtors' well-known grocery stores throughout the Northeast. Most of these goods are high turnover, perishable inventory, . . . all of which must be replaced frequently and quickly to ensure that the Debtors' shelves suddenly do not go barren.  Thus, the Debtors' businesses and cash flow are dependent on a carefully-designed inventory system that ensures the efficient delivery and sale of goods on a daily basis.  It is absolutely essential to the success of these chapter 11 cases that the Debtors' supply chain for inventory remains uninterrupted. Even a short-term disruption could be catastrophic to the Debtors' operations and businesses."

Critical Vendor Motion, ¶ 1 (emphasis provided).

The Critical Vendor Motion also made clear why beer distributors such as MBD[6] were a primary focus of the Debtors' urgent need for critical vendor relief:

> "To keep their businesses running efficiently and seamlessly, the Debtors rely on a carefully designed inventory system through which their almost 300 store locations receive daily deliveries of … [among other products] beer, wine and liquor via direct-store delivery or similar supply processes."

Critical Vendor Motion, ¶ 13 (emphasis provided).

> "[T]he Debtors' beer, wine and liquor distributors …  are governed by unique state laws that may require them to impose immediate cash-on-delivery terms under certain circumstances."

Critical Vendor Motion, ¶ 2 (emphasis provided).

> "[I]n certain jurisdictions, beer, wine, and liquor distributors also possess special rights under non-bankruptcy law. Specifically, the Debtors' failure to timely pay a single beer, wine, or liquor distributor in these jurisdictions may cause merchandisers to "post" the Debtors' account to an applicable regulatory agency, requiring all other beer, wine, or liquor distributors in that jurisdiction to put the Debtors on immediate, cash-on-delivery terms. *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 9 § 68.6 ("Subsequent to the receipt of a notice of default from any wholesaler no retail licensee shall purchase or accept any delivery of alcoholic beverages except for cash until such time as he has received a release in writing from the Liquor Authority or his name is removed from the delinquent list.")"

---

[6] Footnote 2 above addresses the relationship between the named defendant (Manhattan Beer Distributors, Inc.) and MBD.

Critical Vendor Motion, ¶ 15 (emphasis in original).

> "The unique rights available to alcoholic beverage vendors and milk vendors, in particular, have justified payment of such vendors' pre-petition claims in comparable supermarket bankruptcies."

Critical Vendor Motion, footnote 7.

On July 21, 2015, this Court entered an amended interim order granting the Critical Vendor Motion [Docket No. 95]. On August 11, 2015, this Court entered a final order granting the Critical Vendor Motion [Docket No. 503]. Under these Critical Vendor Orders:

1. The Debtors were authorized (but not directed) to pay Critical Vendors in accordance with the Critical Vendor Payment Protocol approved by the Court up to the aggregate amount of $28.3 million. (Decretal par. 8).

2. Any party who accepts payment from the Debtors of a Critical Vendor Claim (regardless of whether a Vendor Agreement has been executed) shall be deemed to have agreed to the terms and provisions of the Final Order and shall be deemed to have waived, to the extent so paid, any and all prepetition claims, of whatever type, kind or priority, against the Debtors, their properties and estates, their directors, officers and employees up to the amount paid. (Decretal par. 11).

3. In the event that a Critical Vendor "accepts payment from the Debtors of a Critical Vendor Claim and does not continue supplying goods or services to the Debtors on trade terms at least as favorable to the Debtors as those terms governing practices and programs . . . within 360 days prior to the Commencement Date, or such other trade terms that are acceptable to the Debtors in their sole discretion ... the Debtors may, in their discretion, (a) declare that the payment of the Critical Vendor is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or goods from such Critical Vendor ..." (Decretal par. 12).

Both before and after the Commencement Date, MBD supplied beer to many of the Debtors' retail grocery stores. There was no contract between the Debtors and MBD that

obligated MBD to supply beer to the Debtors. Rather, MBD sold beer to A&P on an at-will basis.

MBD was one of A&P's critical vendors, and the Debtors paid the balance of A&P's pre-petition debt to MBD under the Critical Vendor Orders.

**D.    The Complaint[7]**

The Complaint alleges two claims for relief:  first, a claim for avoidance of allegedly preferential transfers under Section 547 of the Bankruptcy Code, and second, a claim for recovery under Section 550 of the Bankruptcy Code.

Paragraph 10 of the Complaint alleges that "[p]rior to the Petition Date, [A&P] made certain payments to Defendant for goods and/or services provided to the Debtors pursuant to invoices or statements submitted by Defendant to the Debtors, including but not limited to the transactions between the parties identified on Exhibit A [to the Complaint]." Exhibit A to the Complaint lists alleged transfers with "invoice dates" between April 4, 2015 and July 4, 2015, and "payment dates" between April 22, 2015 and July 13, 2015.

## STANDARDS FOR DISMISSAL OF THE COMPLAINT

Federal Rule of Civil Procedure 12(b)(6) provides, in relevant part, that a complaint should be dismissed for "failure to state a claim upon which relief can be granted." *Fed. R. Civ. P.* 12(b)(6) (made applicable to adversary proceedings by *Fed. R. Bankr. P.* 7012(b)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

---

[7] In considering this motion to dismiss, this Court assumes that properly pleaded allegations of fact in the Complaint are true. However, the Defendant disputes many of the factual allegations in the Complaint.

"A pleading that offers only 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. at 555.  In other words, it is insufficient to plead "threadbare recitals of a cause of action's elements, supported by mere conclusory statements ... ." *Iqbal*, 556 U.S. at 678.  Thus, while the court on a motion to dismiss ordinarily accepts properly-pleaded factual allegations in the Complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

In considering a Rule 12(b)(6) motion, a court may take judicial notice of publicly-available documents. *See, e.g., Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004), citing *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002).[8]

## BURDEN OF PROOF

The Committee must prove by a preponderance of the evidence that each alleged payment meets all the requirements of Section 547(b). *See* 11 U.S.C. § 547(g); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d Cir. 1996).

If the Committee can carry its burden of proving that each alleged transfer satisfies all the elements of Section 547(b) (which it cannot, for the reasons discussed below), then to avoid liability, the Defendant has the burden of proving at least one of the affirmative defenses under Section 547(c), such as the ordinary course of business defense.

## LEGAL AUTHORITY

For the reasons addressed below, the Complaint must be dismissed *with prejudice*.

---

[8] In support of its Motion to Dismiss, the Defendant relies on documents that were filed with this Court in the Debtors' main bankruptcy case, as well as on certain other matters of public record.

**A.    Defendant's Ordinary Course of Business Defense
Under Section 547(c)(2)(B) Warrants Dismissal of the Complaint**

Under Section 547(c)(2) of the Bankruptcy Code, the Committee cannot avoid any transfer:

> to the extent that such transfer was in payment of a debt incurred
> by the debtor in the ordinary course of business or financial affairs
> of the debtor and transferee, and such transfer was –
>
> (A)  made in the ordinary course of business or financial affairs
> of the debtor and the transferee; or
>
> (B)  made according to ordinary business terms.

In this case, the Committee cannot rebut the Defendant's ordinary course of business defense under Section 547(c)(2)(B), because (a) as the Committee acknowledged in paragraph 10 of the Complaint, the transfers at issue were in payment of debts that A&P incurred in the ordinary course of business or financial affairs of A&P and MBD, and (b) A&P made those transfers according to ordinary business terms (*i.e.*, under the 2015 Credit Calendar).   As the Committee cannot overcome this defense, the Complaint should be dismissed *with prejudice*.

First, MBD is a wholesale distributor that sold and delivered a substantial volume of beer to A&P, both pre- and post-petition.   Indeed, the alleged transfers listed in Exhibit A to the Complaint represent payments for beer acquired from MBD in the ordinary course of A&P's and MBD's business or financial affairs.   As the Committee acknowledged in Paragraph 10 of the Complaint:

> "Prior to the Petition Date, [A&P] made certain payments to
> Defendant for goods and/or services provided to the Debtors
> pursuant to invoices or statements submitted by Defendant to the
> Debtors, including but not limited to the transactions between the
> parties identified on Exhibit A attached hereto."

Complaint, ¶ 10.

11

Second, the alleged transfers that are the subject of the Complaint were "made according to ordinary business terms" under Section 547(c)(2)(B). In the Second Circuit, the phrase "made according to ordinary business terms" refers broadly to customary terms and conditions used by other parties in the same industry facing the same or similar problems. *See, e.g., In re Roblin Indus., Inc.*, 78 F.3d at 39. Under this standard, "ordinary business terms" refers to the general practices of similar industry members, and "only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope" of this subsection. *Id.* at 39-40, citing *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993); *see also Pereira v. United Parcel Service of America, Inc. (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 828-29 (Bankr. S.D.N.Y. 2014); *Ganis Credit Corp. v. Anderson (In re Jan Weilert RV, Inc.)*, 315 F.3d 1192, 1198 (9th Cir. 2003), as amended by 326 F.3d 1028 (9th Cir. 2003) (stating that only a transaction that is so unusual or uncommon as to render it an aberration in the relevant industry, falls outside the broad range of terms encompassed by the meaning of "ordinary business terms.").[9]

Thus, under Section 547(c)(2)(B), a creditor must "demonstrate that the terms of a payment for which it seeks the protection of the ordinary course of business exception fall within the bounds of ordinary practice of others similarly situated." *In re Roblin Indus., Inc.*, 78 F.3d at 41. "Ordinary business terms include the terms employed by similarly situated debtors and creditors facing the same or similar problems. If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry." *Id.* at 42.

---

[9] The creditor's industry is the measure for ordinariness under Section 547(c)(2)(B). *See, e.g., In re Lyondell Chemical Co.*, No. 10-05358, 2015 WL 5560283 (Bankr. S.D.N.Y. Sept. 18, 2015); *In re Waterford Wedgwood USA, Inc.*, 508 B.R. at 828.

The Defendant has met this burden, because the payments for beer that are the subject of the Complaint were all made under terms and conditions customary – indeed, required – in the New York State beer industry, namely, the credit terms in the 2015 Credit Calendar.

Under Section 101-aaa of the New York State Alcoholic Beverage Control Law, no licensed manufacturer or wholesaler is to sell or deliver beer to any retail licensee except (a) for cash to be paid at the time of delivery; or (b) on terms requiring payment on or before the final payment date of any credit period within which delivery is made, as set forth in the SLA's Credit Calendar.[10] In compliance with this industry-wide legal requirement, the alleged payments for beer that are the subject of the Complaint – which are all alleged to have been made in 2015 – were required to be made by the Debtors within the credit terms set forth in the 2015 Credit Calendar. Because the payments at issue in the Complaint were made according to customary business terms applicable to *all* wholesale purchases and sales of beer in New York State, none of them are avoidable under Section 547 of the Bankruptcy Code.

Thus, the Committee cannot overcome the ordinary course of business defense under Section 547(c)(2)(B), because the transfers that are the subject of the Complaint were (a) in payment of debts incurred by A&P in the ordinary course of A&P's and MBD's business or financial affairs, and (b) made according to ordinary business terms.

**B.** **Plaintiff Cannot Establish the Section 547(b)(5) Element of Its Preference Claim**

Under Section 547(b)(5) of the Bankruptcy Code, for a transfer to be avoidable as a preference, it must enable the creditor to receive more than it would have received if —

      (A)  the case were under Chapter 7 of the Bankruptcy Code;

---

[10] As the Debtors admit in Paragraphs 2 and 15 of the Critical Vendor Motion, a retailer's failure to pay wholesale beer distributors within the credit terms stated in the Credit Calendar can result in the retailer not being permitted to acquire any alcoholic beverages from any wholesaler in New York State other than for cash on delivery.

    (B)  the transfer had not been made; and

    (C)  such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

*See* 11 U.S.C. § 547(b)(5); *see also In re Kiwi Int'l Airlines, Inc.*, 344 F.3d 311, 317 (3d Cir. 2003) (stating that the court is to compare what the creditor actually received and what it would have received under the chapter 7 distribution provisions of the Bankruptcy Code in order to determine whether the creditor received more than its fair share.).

As discussed above, under Section 101-aaa of the New York State Alcoholic Beverage Control Law, the Debtors were required to pay for beer purchased from wholesalers such as MBD on the credit terms stated in the SLA's Credit Calendar. For example, if the Debtors had purchased beer between January 5, 2015 and January 18, 2015, the 2015 Credit Calendar required payment *in full* to the wholesaler by January 30, 2015 (representing the "final payment date" in the 2015 Credit Calendar). If the Debtors failed to pay the wholesaler *in full* in accordance with the 2015 Credit Calendar, the wholesaler reports this payment delinquency as per the 2015 Credit Calendar, and based upon that reported delinquency, the Debtors would be precluded from purchasing alcoholic beverage products from any wholesaler in New York State except under cash-on-delivery terms.[11]

Accordingly, if A&P had failed to pay MBD prior to the Commencement Date – including during the 90 day preference period – for any purchases of beer it acquired before the Commencement Date, A&P would have had to pay for those purchases *in full* post-petition as required by New York State law. Otherwise, it would be compelled to pay cash for all alcohol purchases from any wholesaler. Of course, as the Debtors admitted in the Critical Vendor

---

[11] N.Y. Comp. Codes R. & Regs. Tit. 9 § 68.6 ("Subsequent to the receipt of a notice of default from any wholesaler no retail licensee shall purchase or accept any delivery of alcoholic beverages except for cash until such time as he has received a release in writing from the Liquor Authority or his name is removed from the delinquent list. …").

Motion, paying cash on delivery for beer was not then feasible for them, as "[a]ny further reduction in working capital could [have] prove[d] devastating to the Debtors' operations and efforts to maximize value." Critical Vendor Motion, ¶ 16.[12]  Accordingly, MBD's receipt of payments from A&P during the preference period did *not* enable MBD to receive more than it would have obtained in a Chapter 7 case, because A&P had to – and indeed did – pay *in full* (either before or after the filing of the bankruptcy case) for all beer purchases from MBD.  This alone mandates dismissal of the Complaint for failure to state a claim.

The fact that the alleged transfers challenged in the Complaint were made before the entry of the Critical Vendor Orders does not excuse this failure of proof on the part of the Committee.  In the Critical Vendor Orders, this Court granted the Debtors discretion to pay their pre-petition debt to critical vendors up to $28.3 million, the *quid pro quo* for which was the critical vendor's commitment to continue providing goods and services to the Debtors on trade terms at least as favorable as those in effect before the Commencement Date.  Based on this authorization, the Debtors paid MBD the balance of its existing pre-petition debt, in return for which MBD continued to provide beer to the Debtors on trade terms at least as favorable as those in effect before the Commencement Date.

Critical vendors like MBD assumed substantial risk by agreeing to continue doing business on existing credit terms with the financially-strapped Debtors after the Commencement Date, including the risk of administrative insolvency.  By agreeing to take on this risk under the

---

[12] In the Critical Vendor Motion, the Debtors specifically acknowledged their need to pay the debt owed to their alcoholic beverage wholesalers.  They stated that it was "absolutely essential to the success of these Chapter 11 cases" that they be given the authority to "pay the prepetition claims (up to a cap) of only those vendors verified as 'critical' to the Debtors' operations", including "approximately 80 active accounts with beer, wine, liquor and milk suppliers" *See* Critical Vendor Motion, ¶¶ 1, 3, 19.  It was, in fact, essential, because through the Critical Vendor Orders, the Debtors were assured of a continued supply of beer on customary credit terms, and the ability to remain in compliance with the 2015 Credit Calendar, thereby avoiding the liquidity squeeze and resulting business disruption and chaos that would have ensued if the Debtors' grocery stores were required to pay cash on delivery for all alcoholic beverage products they acquired from New York State wholesalers.

terms of the Critical Vendor Orders, MBD continued providing beer and helped the Debtors preserve their liquidity, which directly benefited the Debtors' creditors (including the unsecured creditors whose interests are represented by the Committee).[13]

Yet *nothing* in the Critical Vendor Motion papers or the Critical Vendor Orders even remotely suggested that the A&P bankruptcy estate could bring preference actions against a critical vendor at a later date.[14]   If the Critical Vendor Motion had disclosed, or the Critical Vendor Orders had stated, that preference actions against critical vendors could be brought later – in essence, paying cash to critical vendors with one hand, but taking it back from them with the other hand – it is far from clear whether MBD would have continued to supply beer to the Debtors on customary trade terms.[15]  In other words, dismissal of the Complaint *with prejudice* is necessary to prevent the Committee from unfairly reneging on the explicit bargain that MBD upheld with the Debtors, which were stated in the Critical Vendor Orders.

For similar reasons, courts have held that an unsecured creditor whose prepetition claim is paid post-petition pursuant to a Court order, or a Court-approved stipulation, cannot then be

---

[13] As represented by the Debtors, "the Critical Vendor Payment Protocol is crucial to the success of these Chapter 11 cases and maximizing creditor recoveries." (Critical Vendor Motion, ¶ 16) (emphasis provided).

[14] Decretal paragraph 15 of the Interim and Final Critical Vendor Orders both provided in pertinent part that "nothing herein shall impair or prejudice the Debtors' ability to contest, in their sole discretion, the extent, perfection, priority or validity, or amounts of any claims or liens held by any Critical Vendor and the Debtor's right to contest the extent, perfection, priority or validity, or seek the avoidance of all such liens or the priority of such claims are fully preserved;" That language simply did not preserve the right to bring preference actions against critical vendors.

[15] Instructive on this point is *In re Friedman's Inc.*, 738 F.3d 547 (3d Cir. 2013), where the Chapter 11 debtor moved the Bankruptcy Court for authority to pay independent contractors and employees prepetition wages, compensation and related benefits (the "Wage Order").  After the Bankruptcy Court granted the debtor this authority and the debtor paid a prepetition claim of a provider of staffing services, the successor in interest to the debtor brought a preference claim against the provider of staffing services.  In affirming the lower courts' dismissal of the preference claim based on a new value defense under Section 547(c)(4), the Third Circuit stated that "[i]f we allowed payments made pursuant to the Wage Order to increase [the provider of staffing services] preference liability ... we would be giving with one hand and taking away with the other," inconsistent with the intent of the Wage Order.  That would also be the case here if the Committee were permitted to avoid pre-petition payments to critical vendors, even though the Critical Vendor Orders did not preserve the estate's right to bring preference actions against critical vendors.

16

compelled in a preference action to return payments of pre-petition debt. *See In re AFA Investment Inc. v. Trade Source, Inc. (In re AFA Investment, Inc.)*, 538 B.R. 237 (Bankr. D. Del. 2015) (dealing with a critical vendor), citing *Kiwi Int'l Air Lines*, 344 F.3d at 321 (dealing with the counterparty to an assumed contract) and *Seidle v. GATX Leasing*, 778 F.2d 659 (11th Cir. 1985) (dealing with a creditor whose claim was paid under Section 1110).[16]

For the foregoing reasons, the Committee cannot establish that the Section 547(b)(5) element has been satisfied, and the Complaint should be dismissed *with prejudice*.

**C.**   **This Preference Action Has Been Waived Under the Critical Vendor Orders**

This preference action against MBD has been waived under the principle of *expressio unius est exclusio alterius* (the inclusion of one is to the exclusion of others). *See, e.g., In re Oakwood Homes Corp.*, 394 B.R. 352 (Bankr. D. Del. 2008); *In re Quisenberry*, 295 B.R. 855 (Bankr. N.D. Tex. 2003).

As discussed above, the Critical Vendor Orders expressly reserved certain enumerated rights for the Debtors' estates vis-à-vis critical vendors. For example, the Critical Vendor Orders specified that the Debtors retained the ability to contest claims or liens held by critical vendors and to seek the avoidance of liens held by critical vendors. Yet *nothing* in the Critical Vendor Orders even suggested that preference actions against critical vendors were preserved. In light of

---

[16] Some courts have permitted preference actions to proceed against critical vendors where the alleged preferential payments were made (as here) prior to the entry of the court order authorizing payment of critical vendors. *See, e.g., Zenith Industrial Corp. v. Longwood Elastomers, Inc. (In re Zenith Industrial Corp.)*, 319 B.R. 810 (Bankr. D. Del. 2005); *HLI Creditor Trust v. Export Corp. (In re Hayes Lemmerz Int'l, Inc.)*, 313 B.R. 189 (Bankr. D. Del. 2004); *In re Furr's Supermarkets, Inc.*, 485 B.R. 672, 704-06 (Bankr. D. N.M. 2012). These cases, however, are distinguishable from the instant adversary proceeding, because none of them addressed the issue where, as here, applicable non-bankruptcy law required the debtor to pay the creditor in full within a fixed period of time. For example, in *Hayes Lemmerz* and *Zenith*, the Courts noted that the critical vendor orders in those cases were permissive and not mandatory. Here, however, the Debtors were required under New York State law to pay the debt they owed to MBD in full and on a timely basis, because it was essential to the success of these Chapter 11 cases for the Debtors to avoid having to pay for future alcoholic beverage purchases on a cash-on-delivery basis.

the absence of an express reservation of preference actions in the Critical Vendor Orders – while

other rights of the estates were specifically reserved – the Complaint should be dismissed.

## CONCLUSION

For all the foregoing reasons, the Defendant respectfully requests that this Court: (a)

dismiss the Complaint *with prejudice* pursuant to *Fed. R. Civ. P.* 12(b)(6) and *Fed. R. Bank. P.*

7012(b), and (b) grant it such other relief as the Court deems just and proper.[17]

Dated: September 25, 2017

TANNENBAUM HELPERN SYRACUSE
& HIRSCHTRITT LLP

*/s/ Michael J. Riela*
Michael J. Riela
900 Third Avenue, 13th Floor
New York, New York 10022
Telephone: (212) 508-6700
Facsimile: (212) 371-1084
Email:  Riela@thsh.com

*Counsel to the Defendant*

---

[17] The Defendant reserves the right to challenge each of the preference requirements under Section 547(b), and raise additional affirmative defenses under Section 547(c), in the event that the Complaint is not dismissed.

# EXHIBIT 1

## 2015 Credit Calendar

## 2015 BEER and WINE PRODUCTS Credit Calendar
### State of New York Division of Alcoholic Beverage Control
### State Liquor Authority

Section 101-aaa of the New York Alcoholic Beverage Control Law provides, in part, that ALL Retail Licensees (except package stores) who purchase BEER and/or WINE PRODUCTS for resale (for on-premises or off-premises consumption) shall pay cash at the time of delivery, or on terms requiring payment no later than the FINAL PAYMENT DATE for the CREDIT PERIOD during which the delivery was made.

**The Alcoholic Beverage Control Law establishes the following CREDIT PERIODS, FINAL PAYMENT DATES, DELINQUENT NOTICE DATES, and NOTIFICATION DATES for 2015.**

| CREDIT PERIOD | | FINAL PAYMENT DATE | Delinquent Notice Date | | Notification Date | |
|---|---|---|---|---|---|---|
| DELIVERIES MADE ON AND AFTER THIS DATE | UP TO AND INCLUDING THIS DATE | MUST BE PAID FOR ON OR BEFORE THIS DATE. | WHOLESALER NOTICE TO RETAIL LICENSEE | | WHOLESALER NOTICE TO STATE LIQUOR AUTHORITY | |
| Monday | Sunday | Friday | Weds. | Thurs. | Thurs. | Fri. |
| DEC. 8 ('14) | DEC. 21 ('14) | JAN. 2 | JAN. 7 | | JAN. 8 | |
| DEC. 22 ('14) | JAN. 4 | JAN. 16 | JAN. 22 | | JAN. 23 | |
| JAN. 5 | JAN. 18 | JAN. 30 | FEB. 4 | | FEB. 5 | |
| JAN. 19 | FEB. 1 | FEB. 13 | FEB. 19 | | FEB. 20 | |
| FEB. 2 | FEB. 15 | FEB. 27 | MAR. 4 | | MAR. 5 | |
| FEB. 16 | MAR. 1 | MAR. 13 | MAR. 18 | | MAR. 19 | |
| MAR. 2 | MAR. 15 | MAR. 27 | APR. 1 | | APR. 2 | |
| MAR. 16 | MAR. 29 | APR. 10 | APR. 15 | | APR. 16 | |
| MAR. 30 | APR. 12 | APR. 24 | APR. 29 | | APR. 30 | |
| APR. 13 | APR. 26 | MAY. 8 | MAY. 13 | | MAY. 14 | |
| APR. 27 | MAY. 10 | MAY 22 | MAY. 28 | | MAY. 29 | |
| MAY 11 | MAY. 24 | JUN. 5 | JUN. 10 | | JUN. 11 | |
| MAY 25 | JUN. 7 | JUN. 19 | JUN. 24 | | JUN. 25 | |
| JUN. 8 | JUN. 21 | JUL. 3 | JUL. 8 | | JUL. 9 | |

| CREDIT PERIOD | | FINAL PAYMENT DATE | Delinquent Notice Date | | Notification Date | |
|---|---|---|---|---|---|---|
| DELIVERIES MADE ON AND AFTER THIS DATE | UP TO AND INCLUDING THIS DATE | MUST BE PAID FOR ON OR BEFORE THIS DATE. | WHOLESALER NOTICE TO RETAIL LICENSEE | | WHOLESALER NOTICE TO STATE LIQUOR AUTHORITY | |
| Monday | Sunday | Friday | Weds. | Thurs. | Thurs. | Fri. |
| JUN. 22 | JUL. 5 | JUL. 17 | JUL. 22 | | JUL. 23 | |
| JUL. 6 | JUL. 19 | JUL. 31 | AUG. 5 | | AUG. 6 | |
| JUL. 20 | AUG. 2 | AUG. 14 | AUG. 19 | | AUG. 20 | |
| AUG. 3 | AUG. 16 | AUG. 28 | SEP. 2 | | SEP. 3 | |
| AUG. 17 | AUG. 30 | SEP. 11 | SEP. 16 | | SEP. 17 | |
| AUG. 31 | SEP. 13 | SEPT. 25 | SEPT. 30 | | OCT. 1 | |
| SEP. 14 | SEP. 27 | OCT. 9 | OCT. 15 | | OCT. 16 | |
| SEP. 28 | OCT. 11 | OCT. 23 | OCT. 28 | | OCT. 29 | |
| OCT. 12 | OCT. 25 | NOV. 6 | NOV. 12 | | NOV. 13 | |
| OCT. 26 | NOV. 8 | NOV. 20 | NOV. 25 | | NOV. 27 | |
| NOV. 9 | NOV. 22 | DEC. 4 | DEC. 9 | | DEC. 10 | |
| NOV. 23 | DEC. 6 | DEC. 18 | DEC. 23 | | DEC. 24 | |
| DEC. 7 | DEC. 20 | JAN. 1 ('16) | JAN. 6 ('16) | | JAN. 7 ('16) | |
| DEC. 21 | JAN. 3 ('16) | JAN. 15 ('16) | JAN. 21 ('16) | | JAN. 22 ('16) | |

Shaded days reflect extensions based on holidays and/or intervening holidays. A holiday extends performance of the required act an extra day.